UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEVA PHARMACEUTICAL INDUSTRIES LTD., TEVA PHARMACEUTICAL WORKS PRIVATE LIMITED COMPANY, TEVA PHARMACEUTICALS CURACAO nv, TEVA PHARMACEUTICALS FINANCE SWITZERLAND GmbH, and TEVA FINANCE SERVICES B.V.,<br><br>  Plaintiffs,<br><br>  v.<br><br>DEUTSCHE BANK SECURITIES, INC., AND DEUTSCHE BANK AG,<br><br>  Defendants. | CASE NO. 09 CV 6205 (AKH) |

**REPLY MEMORANDUM OF DEFENDANTS
DEUTSCHE BANK SECURITIES INC. AND DEUTSCHE BANK AG
IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT**

**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York  10178-0060
Phone: 212.309.6000
Fax: 212.309.6001

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER THE SECURITIES ACT ............ 2

    A.    Plaintiffs Fail to Allege that They Purchased Their ARS from DBSI .................. 2

    B.    Plaintiffs Fail to Allege Facts Showing that PPMs Should be Considered
        "Prospectuses" ...................................................................................... 6

    C.    Plaintiffs Fail to State a "Control-Person" Claim Against DB-AG ...................... 9

III.  PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER THE EXCHANGE ACT ............. 9

    A.    Plaintiffs' Misrepresentation Claim Fails for a Lack of Particularity ................... 9

        1.    Plaintiffs Do Not Allege a Material Misrepresentation ........................... 10

        2.    Plaintiffs Do Not Allege a Strong Inference of Scienter ......................... 14

                a.    Plaintiffs Fail to Allege a Fraudulent Motive ............................. 14

                b.    Plaintiffs Fail to Allege Conscious Misbehavior ........................ 19

        3.    Plaintiffs Do Not Allege Justifiable Reliance ........................................ 21

                a.    Plaintiffs' "Fraud-on-the-Market" Theory is Inapplicable .......... 21

                b.    Plaintiffs' "Fraud-Created-the-Market" Theory is
                     Inapplicable ................................................................................ 23

        4.    Plaintiffs Do Not Allege Loss Causation .............................................. 26

                a.    Plaintiffs' Loss Causation Allegations Lack Particularity ........... 26

                b.    Plaintiffs' Loss Causation Allegations Lack Plausibility ............ 28

    B.    Plaintiffs' Market Manipulation Claim Fails for a Lack of Particularity ............ 30

    C.    Plaintiffs Fail to State a "Control-Person" Claim Against DB-AG ..................... 34

IV.   PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER NEW YORK COMMON
     LAW ........................................................................................................... 34

V.    CONCLUSION ................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*AIG Global Secs. Lending Corp. v. Banc of Am. Secs. LLC*,
  254 F. Supp. 2d 373 (S.D.N.Y. 2003)......................................................................7

*In re American Bank Note Holographics*,
  93 F. Supp. 2d 24 (S.D.N.Y. 2000)......................................................................5, 6

*In re AOL Time Warner, Inc. Sec. Litig.*,
  503 F. Supp. 2d 666 (S.D.N.Y.  2007)....................................................................27

*ATSI v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)....................................................................................14

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  651 F. Supp. 2d 155 (S.D.N.Y. 2009)...................................................................18

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) .....................................................................................16

*Anegada Master Fund, Ltd. v. PXRIE Group Ltd.*,
  No. 08 CV 10584, 2010 WL 299478, (S.D.N.Y. January 26, 2010)........................9

*Ashcroft v. Iqbal*,
  __ U.S __, 129 S. Ct. 1937 (2009).................................................................2, 8, 9

*Ashland, Inc. v. Oppenheimer & Co., Inc.*, No. 09 Civ. 00135,
  2010 U.S. Dist. LEXIS 15335 (E.D. Ky. Feb. 22, 2010) .................................29, 35

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  No. 08-4363-CV, 2009 WL 2591173 (2d Cir. Aug. 24, 2009)...............................20

*Basic v. Levinson*,
  485 U.S. 224 (1988).......................................................................................21, 22

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975).............................................................................................30

*In re Bristol-Meyers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)...................................................................19

*Capri v. Murphy*,
  856 F.2d 473 (2d Cir. 1988)...................................................................................5

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Catton v. Defense Tech. Sys. Inc.*,
  No. 05 Civ. 6454, 2006 WL 27470 (S.D.N.Y. January 3, 2006).......................................26, 27

*Chill v. G.E. Co.*,
  101 F.3d 263 (2d Cir. 1996)..........................................................................................18, 19

*In re Citigroup Auction Rate Securities Litigation*,
  No. 08 Civ. 3095, 2009 WL 2914370 (S.D.N.Y. September 11, 2009) ..........................*passim*

*Connolly v. Havens*,
  763 F. Supp. 6 (S.D.N.Y. 1991).............................................................................................31

*Cowen & Co. v. Merrian*,
  745 F. Supp. 925 (S.D.N.Y. 1990).........................................................................................32

*Davidoff v. Farina*,
  No. 04 Civ. 7617, 2005 WL 2030501 (S.D.N.Y. August 22, 2005).......................................19

*Defer LP v. Raymond James Financial, Inc.*,
  654 F. Supp. 2d 204 (S.D.N.Y. 2009)....................................................................................16

*Donovan v. Am. Skandia Life Assur. Corp.*,
  96 Fed. Appx. 779 (2d Cir. 2004)............................................................................................9

*In re Doral Fin. Corp. Sec. Litig.*,
  563 F. Supp. 2d 461 (S.D.N.Y. 2008)....................................................................................16

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).................................................................................................................26

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
  551 F. Supp. 2d 210 (S.D.N.Y. 2008)....................................................................................15

*Emergent Capital  Inv. Mgmt. LLC v. Stonepath Group., Inc.*,
  343 F.3d 189 (2d Cir. 2003)..............................................................................................24, 25

*In re Enron Corp. Securities*,
  529 F. Supp. 2d 644 (S.D.Tex. 2006) .....................................................................................22

*ESI Montgomery County v. Motenay Int'l Corp.*,
  899 F. Supp. 1061 (S.D.N.Y. 1995)..........................................................................................8

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Company of New York*,
  375 F.3d 168 (2d Cir. 2004).....................................................................................................9

iii

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Fecht v. Price Co.*,
　70 F.3d 1078 (9th Cir. 1995) ........................................................................... 10-12

*Feiner v. SS&C Technologies*,
　11 F. Supp. 2d 204 (D. Conn. 1998) ................................................................10, 12

*Fisk v. Super Annuities, Inc.*,
　927 F. Supp. 719 (S.D.N.Y. 1996) ...........................................................................8

*Gotham Holdings, LP v. Health Grades, Inc.*,
　534 F. Supp. 2d 442 (S.D.N.Y. 2008) ......................................................................7

*Gustafson v. Alloyd Co.*,
　513 U.S. 561 (1995) .................................................................................................6, 7

*Halperin v. eBanker USA.com, Inc.*,
　295 F. 3d 352 (2d Cir. 2002) ..................................................................................13

*Hunt v. Alliance North American Government Income Trust, Inc.*,
　159 F. 3d 723 (2d Cir. 1998) ..............................................................................10, 11

*In re Initial Public Offering Sec. Litig.*,
　227 F.R.D. 65 (S.D.N.Y. 2004) ..............................................................................22

*In re Initial Public Offering Sec. Litig.*,
　471 F.3d 24 (2d Cir. 2006) .....................................................................................23

*In re Initial Public Offering Sec. Litig.*,
　544 F. Supp. 2d 277 (S.D.N.Y. 2008) ....................................................................21

*Joffee v. Lehman Bros., Inc.*,
　410 F. Supp. 2d 187 (S.D.N.Y. 2006) ................................................................13, 14

*Kalnit v. Eichler*,
　264 F.3d 131 (2d Cir. 2001) ..............................................................................10, 14

*Kempner v. Oppenheimer & Co., Inc.*,
　662 F. Supp. 1271 (S.D.N.Y. 1987) .......................................................................32

*Lentell v. Merrill Lynch & Co., Inc.*,
　396 F.3d 161 (2d Cir. 2005) ...................................................................................26

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*,
　652 F. Supp. 2d 576 (E.D. Pa. 2009) .....................................................................19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Marsh & McLennan Companies, Inc. Securities Litigation*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)........................................................................15

*In re Merrill Lynch & Co., Inc. Res. Rpts. Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003)........................................................................16

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)............................................................................................13

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)........................................................................13

*Pinter v. Dahl*,
    486 U.S. 622 (1988)....................................................................................................4

*Police/Fire Retirement System of the City of New York v. Safe Net, Inc.*,
    No. 06 Civ. 5797, 2009 WL 2391849 (S.D.N.Y. August 5, 2009)..........................2

*In re Refco, Inc., Sec. Litig.*,
    609 F. Supp. 2d 304 (S.D.N.Y. 2009)..............................................................23, 24

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................................2, 9

*Ross v. Bolton*,
    639 F. Supp. 323 (S.D.N.Y. 1986)............................................................................7

*In re Royal Ahold, N.V.Sec .and ERISA Litig.*,
    384 F. Supp. 2d 838 (D. Md. 2005)..........................................................................5

*Rubin v. MF Global, Ltd.*,
    634 F. Supp. 2d 459 (S.D.N.Y. 2009)......................................................................13

*S.E.C. v. ICN Pharm., Inc.*,
    84 F. Supp. 2d 1097 (C.D.Cal. 2000) .....................................................................18

*S.E.C. v. Lucent Technologies, Inc.*,
    363 F. Supp. 2d 708 (D.N.J. 2005) .........................................................................18

*SEC v. O'Meally*,
    No. 06 Civ. 6483, 2008 WL 4090461 (S.D.N.Y. September 3, 2008) ....................18

*S.E.C. v. Prater*,
    296 F. Supp. 2d 210 (D.Conn. 2003).......................................................................18

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Scone Investments, L.P. v. American Third Market Corp.*,
    No. 97 Civ. 3802, 1998 WL 205338 (S.D.N.Y. April 28, 1998)............................................31

*Shain v. Duff & Phelps Credit Rating Co.*,
    915 F. Supp. 575 (S.D.N.Y 1996)..................................................................................4

*Sloane Overseas Fund Ltd. v. Sapiens Int'l Comp. N.V.*,
    941 F. Supp. 1369 (S.D.N.Y. 1996)................................................................................8

*In re Sterling Foster & Co., Inc. Sec. Litig.*,
    222 F. Supp. 2d 289 (E.D.N.Y. 2002) ................................................................................26

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008)..........................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................14, 21

*In re Thoratec Corp. Sec. Litigation*,
    No. C-04-03168, 2006 WL 1305226 (N.D. Cal. May 11, 2006)............................................20

*In re Towers Fin. Corp. Noteholders Litig.*,
    No. 93 Civ. 0810, 1995 WL 571888 (S.D.N.Y. September 20, 1995)....................................23

*Varljen v. H.J. Meyers, Inc.*,
    No. 97 Civ. 6742, 1998 WL 395266 (S.D.N.Y. July 14, 1998) ............................................17

*Vetter v. Shearson Hayden Stone Inc.*,
    481 F. Supp. 64 (S.D.N.Y. 1979)..................................................................................31

*In re Vivendi Universal, S.A. Sec. Litig.*,
    No. 02 Civ. 5571, 2009 WL 1066254 (S.D.N.Y. April 21, 2009)..........................................27

*Vogel v. Sands Bros. & Co., Ltd.*,
    126 F. Supp. 2d 730 (S.D.N.Y. 2001)..............................................................................15

*In re Worldcom, Inc. Sec. Litig.*,
    294 F.3d 431 (2d Cir. 2003)..........................................................................................7

*In re Worlds of Wonder Sec. Litigation*,
    35 F. 3d 1407 (9th Cir. 1994) ........................................................................................20

*Yung v. Lee*,
    432 F.3d 142 (2d Cir. 2005)..........................................................................................7

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**FEDERAL STATUTES**

15 U.S.C. § 78u-4(b)(2) ..........................................................................................................14, 18

Defendants Deutsche Bank AG ("DB-AG") and Deutsche Bank Securities Inc. ("DBSI") (collectively, "Deutsche Bank" or "Defendants") respectfully submit this reply memorandum in further support of their Motion to Dismiss Plaintiffs' First Amended Complaint (the "FAC").

## I.    <u>INTRODUCTION</u>

In their Opposition ("Opp."), Plaintiffs, large, sophisticated purchasers of sophisticated debt instruments – auction-rate securities ("ARS") – fail to demonstrate that the allegations of the FAC meet the applicable and stringent pleading standards.  Plaintiffs' failure is not surprising, because the FAC's flaws are not small technical blemishes but gaping, factual defects:

- Plaintiffs' claim under Section 12(a)(1) of the 1933 Securities Act fails because Plaintiffs have not alleged facts showing that DBSI either sold the ARS at issue directly to them or that DBSI directly and actively solicited them;

- Plaintiffs' claim under Section 12(a)(2) of the 1933 Securities Act fails because Plaintiffs have not alleged any facts showing that the ARS were sold in a public offering as opposed to a private placement;

- Plaintiffs' misrepresentation claim under Section 10(b) of the 1934 Exchange Act fails because Plaintiffs have not alleged facts showing that DBSI made a material misrepresentation with the requisite state of mind upon which Plaintiffs justifiably relied and which caused Plaintiffs' alleged loss; and

- Plaintiffs' market manipulation claim under Section 10(b) of the 1934 Exchange Act fails because Plaintiffs have not alleged facts showing that DBSI engaged in any act that would constitute manipulation nor have they alleged facts showing reliance, loss causation, or a strong inference of scienter.

Plaintiffs have sued Defendants for securities fraud even though their ARS investments are not in default and are, in fact, performing according to their terms.  Plaintiffs have sued Defendants for misrepresentation even though the risks Plaintiffs now complain of were prominently and specifically disclosed in the offering documents.  In short, Plaintiffs' fraud claim, as evidenced by the many and substantial factual deficits of the FAC, is nothing more than a non-actionable claim of "fraud by hindsight" and, as such, should be dismissed in its entirety.

## II.    PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER THE SECURITIES ACT

Plaintiffs have alleged two separate claims under the Securities Act.  The first claim, under Section 12(a)(1), is dependent on Plaintiffs alleging facts showing that they purchased the securities at issue from DBSI.  The second claim, under Section 12(a)(2), is dependent on Plaintiff alleging facts showing that DBSI's Private Placement Memoranda ("PPMs") should be considered "prospectuses" because the ARS at issue were sold, not in private placements but in public offerings.

With regard to both claims, Plaintiffs have failed to meet the required pleading standard. Instead of alleging "sufficient factual matter… that is plausible on its face," Plaintiffs have merely tendered "naked assertion[s]" devoid of "further factual enhancement."  *Ashcroft v. Iqbal*, __ U.S __, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted), (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).[1]  Because Plaintiffs have not alleged the necessary facts with the necessary specificity, their Securities Act claims should be dismissed.

### A.    Plaintiffs Fail to Allege that They Purchased Their ARS from DBSI

Plaintiffs argue that in Paragraphs 24-31 of the FAC they allege "which ARS (and in what amount) were purchased directly from DBSI pursuant to DBSI's initial offering of such securities."  (Opp. at. 8.)  Plaintiffs' argument is flatly belied by the plain language of the FAC. For example, Paragraph 29 states as follows:

> 29.    DBSI served as the initial purchaser, broker-dealer and lead manager for an ARS known as Capstan Master trust, Series 3, (CUISP # 14069MAA8 (Capstan 3")).  DBSI began selling these

---

[1]    In its Opening Brief, Defendants urged this Court to apply the heightened pleading requirements of Rule 9(b) to Plaintiffs' Section 12 claim, because the wording and imputations of the FAC (*see, e.g.*, FAC ¶ 52) are "classically associated with fraud.'"  *Police & Fire Retirement System of the City of New York v. SafeNet, Inc.*, No. 06 Civ 5797, 2009 WL 2391849, *10 (S.D.N.Y. Aug. 5, 2009) (*quoting Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004)).  In their Opposition, Plaintiffs did not offer any argument against Deutsche Bank's request.  According, this Court should review the sufficiency of Plaintiffs' Security Act claims under Rule 9(b).

> ARS into the marketplace on or about ***August 2, 2007***.  On or about ***August 8, 2007***, Teva purchased $5,000,000 of these Capstan 3 ARS at par, which Teva continues to hold.

(Emphasis added.)

This paragraph is a model, not of clarity, but of obfuscation.  Plaintiffs do not say which of the five (5) Teva plaintiffs actually purchased the Capstan 3 series.  In addition, while the securities may have been purchased "pursuant" to DBSI's initial offering, as Plaintiffs argue, the clear import of the paragraph is that securities were not actually purchased in the initial offering on August 2, 2007, but later on August 8, 2007 in the after-market.  More critically, Plaintiffs fail to allege from whom the Capstan 3 series were actually purchased.

This calculated ambiguity on the part of Plaintiffs is even more apparent when one considers Paragraphs 30 and 31.  In Paragraph 30, the Camber Master Trust, Series 7 securities were allegedly first offered to the market by DBSI on "January 18, 2007"; the Camber securities that are at issue here (*i.e*., the ones that Plaintiffs purchased and still hold), however, were not purchased by one or more of the unidentified Plaintiffs until "June and August 2007" – ***more than five months later*** after the initial offering.  Similarly, in Paragraph 31, the Camber Master Trust, Series 9 securities were allegedly first offered to the market in March 2007; the securities at issue, however, were not purchased by one or more of the unidentified Plaintiffs until "May 2007" – ***more than two months later*** after the initial offering.  Given that the "Dutch auctions" at which these securities were purchased could have occurred as often as every 7 days (FAC ¶ 21), the number of buyers who previously held title to the securities before the Plaintiffs is potentially quite large.  Plaintiffs' failure in Paragraphs 30 and 31 to identify from whom they purchased the ARS begs the question of how many intermediate purchasers there were of those securities before they ended up in Plaintiffs' hands.

Plaintiffs' failure to allege clearly and simply "who purchased what from whom" is fatal

to their Section 12(a)(1) claim.[2]  Section 12(a)(1), as the Supreme Court has stated, "contemplates a buyer-seller relationship not unlike ***traditional contractual privity***."  *Pinter v. Dahl*, 486 U.S. 622, 642 (1988) (emphasis added).  As the *Pinter* Court further explained, "[Section 12(a)(1)] imposes liability on ***only the buyer's immediate seller***; ***remote purchasers are precluded from bringing actions against remote sellers***.  Thus, a buyer cannot recover against his seller's seller."  *Id*. at 644 n.21 (emphasis added); *see also Shain v. Duff & Phelps Credit Rating Co*., 915 F. Supp. 575, 577 (S.D.N.Y 1996) ("persons are not liable under [Section 12(a)(1)] … unless they ***directly or personally*** solicit the buyer" (emphasis added)).

Here, as demonstrated above, Plaintiffs have not alleged "sufficient factual matter… that is plausible on its face" that Plaintiffs purchased directly from DBSI.  Given the paucity of the alleged facts and the calculated vagueness of the few facts that are alleged, Plaintiffs have fallen well short of their pleading burden with respect to their Section 12(a)(1) claim.

Plaintiffs attempt to escape from the necessary consequences of their own deliberately vague allegations by attaching a transcript from a hearing in *Xethanol Corp. v. Deutsche Bank Securities*, Case No. 07-cv-11161 (AKH).  Plaintiffs' reliance on that transcript is badly misplaced.  As that transcript makes clear, the allegations in that action were very different from the FAC.  The transcript plainly shows that the complaint in *Xethanol* alleged that the securities at issue were purchased by a broker, Northeast, and that "Deutsche Bank knew or reasonably should have known that Northeast was not acting for its own account, it was acting for clients."

---

[2]    Plaintiffs' tortured allegations are due, in all likelihood, to the fact that Plaintiff purchased their ARS from a broker dealer other than DBSI.  As Teva states in its most recent annual report submitted to the SEC, it received in 2008 "$100 million in connection with a settlement agreement with an institution relating to our auction rate securities."  Annual Report of Teva Pharmaceutical Industries Limited to the SEC on Form 20-F for the Fiscal Year ended December 31, 2008 ("Teva's 2008 Annual Report"), at 50; *see also id*. at 59 (same), 60 (same), and F-23 ("Financial income in 2008 included a $100 million cash payment received in connection with a settlement agreement with an institution regarding Teva's auction rate securities portfolio, which Teva continues to hold").  True and correct excerpts from Teva's 2008 Annual Report are attached as Exhibit A to

(Exhibit 1, page 5, lines 11-16, to the Declaration of Laurence A. Schoen in support of Plaintiffs'

Memorandum of Law in Opposition to Defendants' Motion to Dismiss First Amended

Complaint.)  The FAC, in contrast, does not contain any similar allegations – no broker is

identified, nor is it alleged (with or without supporting facts) that DBSI knew or should have

known that the unnamed broker was purchasing the securities for Plaintiffs.[3]

Plaintiffs also attempt to impose liability on DBSI because the ARS at issue allegedly

"were purchased as a result of DBSI's solicitations in subsequent offerings."  (FAC ¶ 32.)  This

allegation is wholly conclusory in nature; the FAC, in other words, does not offer any facts about

the nature of this alleged solicitation of Plaintiffs.  Plaintiffs contend that no such additional facts

are necessary, since DBSI prepared the PPM.  (Opp. at 9-10.)  Plaintiffs' argument is based

principally on two cases:  *Capri v. Murphy*, 856 F.2d 473 (2d Cir. 1988); and *In re American

Bank Note Holographics*, 93 F. Supp. 2d 24 (S.D.N.Y. 2000).  (Opp. at 10.)  Both of these

decisions are easily distinguished from the instant case.

In *Capri*, the defendants were found liable to the plaintiffs under Section 12 because they

engaged in direct solicitation of the plaintiffs:  "Murphy and GCC prepared ***and circulated the

prospectus to plaintiffs*** …. As for LCG, … LCG ***solicited each of the plaintiffs*** to invest in the

venture."  856 F.2d at 479 (emphasis added).  As noted above, there no averments in the FAC

about DBSI actively or directly soliciting any of the Plaintiffs at any time in any manner.

---

the Supplemental Declaration of John M. Vassos filed concurrently herewith ("Suppl. Vassos Declaration").  *See also* Defendants' Supplemental Request for Judicial Notice filed concurrently herewith ("Suppl. RJN").

[3]    Plaintiffs also rely on *In re Royal Ahold, N.V. Sec. & ERISA Litig*., 384 F. Supp. 2d 838 (D. Md. 2005) for the proposition that Plaintiffs' use of a broker does not "negate DBSI's status as a seller within the meaning of Section 12(a)(1)."  (Opp. at 8, n.2.)  Plaintiffs' reliance on *In re Royal Ahold* is badly misplaced.  In that case, a document was produced in connection with the motion to dismiss that showed that the investor purchased the securities from a broker, ABN AMRO Equities U.K., Ltd., for ABN AMRO Bank, N.V.  The court in *In re Royal Ahold* elected not to dismiss plaintiffs' Section 12 claims because the "Bank, together with NM Rothschild & Sons, Ltd, comprise the joint venture ABN AMRO Rothschild which is named as a defendant."  *Id*. at 841.  In other words, the complaint in *In re Royal Ahold* alleged a strong agency relationship between the

5

In *American Bank,* the Securities Act claims involved an initial public offering, not any subsequent sales in the aftermarket. Moreover, in *American Bank*, it was alleged that the underwriter did not merely prepare the prospectus, but "actively" solicited investors in the IPO: "Complaint also alleges ***active solicitation*** of sales which 'included participating in the preparation of the false and misleading Registration Statement and Prospectus ***and participating in 'road shows'*** to promote the sale of [Holographics] common stock.'" 93 F. Supp. 2d at 438 (emphasis added); *see also id*. at 439 ("While it may be true that Holographics was not the owner, and therefore could not transfer title to the shares, Holographics nonetheless ***actively solicited*** the sale of the shares through participation in preparation of the registration statement and prospectus ***and in road shows***" (emphasis added)). In contrast, the FAC does not contain any factual allegations showing that DBSI "actively" solicited any of the Plaintiffs at any time in any manner.

In short, Plaintiffs have failed to allege the facts necessary to support their Section 12(a)(1) claim: The FAC is devoid of any factual allegations that DBSI either directly sold the ARS to Plaintiffs or directly solicited Plaintiffs. Accordingly, Plaintiffs' Section 12(a)(1) claim should be dismissed.

### B.    Plaintiffs Fail to Allege Facts Showing that PPMs Should be Considered "Prospectuses"

The viability of Plaintiffs' Section 12(a)(2) claim is premised on this Court finding that the PPMs supported, not a private offering of securities, but a public one, and as such the PPMs should be considered "prospectuses." As the Supreme Court has explained, liability under Section 12(a)(2) is expressly limited to a misrepresentation in a "prospectus" and "the word

---

broker and the defendant. In contrast, the FAC does not name any broker, let alone one from the same corporate family as DBSI.

'prospectus' is a term of art referring to a document that describes a **public** offering of securities

by an issuer or controlling shareholder." *Gustafson v. Alloyd Co*., 513 U.S. 561, 584 (1995)

(emphasis added).  Noting Congress's failure to indicate any intent to extend Section 12(a)(2)

liability to "private or secondary sale[s]," *id*. at 582, the Court concluded that "[t]he intent of

Congress and the design of the statute require that § 12[(a)](2) **liability be limited to public**

**offerings**," *id*. at 578 (emphasis added).  *See also Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005)

("a Section 12(a)(2) action **cannot** be maintained by a plaintiff who acquires securities through a

private transaction, whether primary or secondary" (emphasis added); *Gotham Holdings, LP v.*

*Health Grades, Inc*., 534 F. Supp. 2d 442, 444-45 (S.D.N.Y. 2008) (dismissing §12(a)(2) claims

and stating, "an essential element of the §12(a)(2) claim is that the omissions or

misrepresentations being sued upon are either contained in or relate directly to a prospectus");

*AIG Global Secs. Lending Corp. v. Banc of Am. Secs. LLC*, 254 F. Supp. 2d 373, 389 (S.D.N.Y.

2003) (dismissing §12(a)(2) claims and stating, "[t]he critical inquiry in determining if § 12(a)(2)

liability exists is whether the securities were sold through a public offering or a private

transaction"); *In re Worldcom, Inc. Sec. Litig.*, 294 F.3d 431, 455 (2d Cir. 2003) (dismissing

§12(a)(2) claims and stating that "offerings made via private placement memoranda … are **not**

public offerings" (emphasis added)).

      Here, Plaintiffs argue that the PPMs should be considered "prospectuses" because the

ARS were purportedly sold to non-Qualified Institutional Buyers or QIBs.  Plaintiffs, however,

fail to allege any facts that would show that any of the Deutsche Bank ARS were in fact sold to

any non-QIB.  The only allegation Plaintiffs are able to muster is that "it now **appears** that" non-

QIBs purchased the ARS (FAC ¶ 7 (emphasis added)), and that Plaintiffs have "discovered

information **suggesting** that DBSI in fact marketed, offered and sold the Pivot and Camber ARS

. . . to individuals and entities that did not qualify for QIB status."  (FAC ¶ 52 (emphasis added.))
This equivocating allegation that Plaintiffs suspect but do not even know whether DBSI sold the
Pivot and Camber ARS to non-QIBs, is patently insufficient.  Further, Plaintiffs fail to allege
*what* information they discovered, *where* they discovered this information, *how* it suggested that
non-QIBs purchased the Pivot and Camber ARS, or *why* this undisclosed information that
suggests that *maybe* non-QIBs purchased the Pivot and Camber ARS has any relevance to the
exempt status of the Capstan ARS.  Simply put, the Plaintiffs fail to allege any facts to support
their "naked assertion" that the ARS were sold to non-QIBs.

In their Opposition, Plaintiffs do not point to any authority which would allow this Court
to make the inferential leap that is required to sustain their Section 12(a)(2) claim.  In fact,
Plaintiffs rely on law expressly superseded by the Supreme Court in *Twombly* and *Iqbal*.  For
example, Plaintiffs point to *Fisk v. Super Annuities, Inc.*, 927 F. Supp. 719 (S.D.N.Y. 1996), and
claim that a bald allegation is sufficient to defeat a motion to dismiss.  (Opp. at 12.)  In *Fisk*, the
court expressly applied the no-set-of-facts test, *id*. at 731, which was "retired" by *Twombly* and
replaced with the "plausibility standard," *Iqbal*, 129 S. Ct. at 1944.  Moreover, *Fisk* is also
distinguished by the fact that the plaintiff there made more than a bald assertion; it actually
provided a list of purchasers of the securities in question from which it could be inferred that the
security was not part of a small private offering.  927 F. Supp. at 730.  Plaintiffs' other cases are
similarly inapposite.  In *Sloane Overseas Fund Ltd. v. Sapiens Int'l Corp., N.V.*, the defendants
never claimed the offering was private and outside the Act's registration requirements.  941 F.
Supp. 1369, 1376 n.11 (S.D.N.Y. 1996).  As for *ESI Montgomery County v. Motenay Int'l Corp.*,
the court's *dicta* in that case is of no benefit to Plaintiffs because, as in *Fisk*, it is based on the
retired no-set-of-facts standard, which would simply have accepted as true the conclusory

8

allegation that a private offering was actually made available to the public.  899 F. Supp. 1061, 1065 (S.D.N.Y. 1995).

In short, the FAC is fatally bereft of the necessary factual allegations to support Plaintiffs' claim that DBSI's private placement memoranda were really "prospectuses" for a public offering of securities.  Where, as here, the complaint does not plead sufficient facts for "the court to infer more than *the mere possibility* of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Iqbal*, 129 S. Ct. at 1950 (*quoting* Fed. R. Civ. P. 8(a)(2) (internal quotation marks omitted; emphasis added)).  Accordingly, Plaintiffs' Section 12(a)(2) claim should be dismissed.  *See Anegada Master Fund, Ltd. v. PXRE Group Ltd*., No. 08 CV 10584, 2010 WL 299478, *4 (S.D.N.Y. Jan. 26, 2010) (dismissing Section 12(a)(2) claim because "[t]he transaction at issue in this case – the sale of the Preferred Shares to Plaintiffs – was clearly styled as, and intended to be, a private placement free from the "prospectus" requirement that attaches to registered, public offerings").

## C.    Plaintiffs Fail to State a "Control-Person" Claim Against DB-AG

Plaintiffs' claim against DB-AG for "control-person" liability under Section 15 of the Securities Act fails because Plaintiffs have failed to state a claim under Section 12.  *Donovan v. Am. Skandia Life Assur. Corp.*, 96 Fed. Appx. 779, 781 (2d Cir. 2004) (affirming dismissal of Section 15 claims due to failure to establish a primary violation under Section 12(a)(2) of the Securities Act); *Rombach v. Chang*, 355 F.3d 164 177-78 (2d Cir. 2004) (same).  Accordingly, Plaintiffs' Section 15 claim should be dismissed.

## III.    PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER THE EXCHANGE ACT

Plaintiffs have alleged in the FAC two separate claims under the Exchange Act:  (a) a "misrepresentation" claim; and (b) a "market manipulation" claim.  Both claims are devoid of the factual particularity required under the Federal Rules and the federal securities laws.

Accordingly, both claims should be dismissed.

### A.    Plaintiffs' Misrepresentation Claim Fails for a Lack of Particularity

In order to successfully allege a misrepresentation claim under section 10(b) and Rule 10b-5, Plaintiffs must allege specific facts demonstrating (1) a misrepresentation or omission of a material fact, (2) made with scienter, (3) on which Plaintiffs justifiably relied, and (4) that proximately caused Plaintiffs' alleged loss.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). If Plaintiffs fail to allege just one of the above elements with the requisite particularity, then their claim is deficient and must be dismissed.  Here, Plaintiffs have not alleged any of the required elements with the necessary specificity required by Rule 9(b) or the PSLRA.  Accordingly, Plaintiffs' misrepresentation claim under the Exchange Act should be dismissed.

### 1.    Plaintiffs Do Not Allege a Material Misrepresentation

According to the FAC, DBSI allegedly failed to disclose three risks:  (a) that ARS auctions might fail, (b) that a secondary market for the ARS at issue might not develop or might not continue indefinitely, and (c) that DBSI might participate in ARS auctions by submitting bids for its own account.  (FAC ¶¶ 4, 56-58, 61.)  As discussed in DBSI's moving papers, each of these risks was prominently and specifically disclosed to Plaintiffs in a separate section of the PPMs entitled "Special Considerations."  (*See* DBSI's Memo. at 4.)

Plaintiffs, in their Opposition, make two arguments.  First, they contend that these disclosures were insufficient because they only "disclosed certain theoretical risks that may occur in the future."  (Opp. at 16.)  Second, Plaintiffs argue that "while DBSI's Offering Memoranda disclosed certain risks, they failed to disclose [certain other] information … which would have been material to a reasonable investor," such as "the frequency with which DBSI has submitted support bids in the past."  (Opp. at 17.)  Plaintiffs' arguments are based on two cases decided by or within the Second Circuit:  *Hunt v. Alliance North American Government Income*

*Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998); and *Feiner v. SS&C Technologies*, 11 F. Supp. 2d 204

(D. Conn. 1998).[4]  (Opp. at 17-18.)  Both of those cases undermine rather than support Plaintiffs'

arguments.

 In *Hunt*, investors brought a securities fraud action against a mutual fund, alleging four

different types of misrepresentations.  The district court dismissed without leave to amend all

four of plaintiffs' claims.  The Second Circuit affirmed with regard to three of the four claims.

*Hunt*, 159 F. 3d at 724.  With regard to the fourth claim, however, the court in *Hunt* reversed.

The court found that plaintiffs had alleged a material misrepresentation claim, because "the

prospectus did not warn of the risk plaintiffs claim was not disclosed."  *Id*. at 729.  Specifically,

the prospectus warned that the fund manager would use hedging techniques to reduce currency

fluctuations.  The plaintiffs alleged that this warning was misleading because the fund knew (or

should have known) that, as a practical matter, the fund could not use hedging techniques to

protect against currency fluctuations.  As the *Hunt* court explained,

> The cautionary language contained in the prospectus does not
> necessarily foreclose liability because ***it warned investors of a***
> ***different contingency than that which plaintiffs allege was***
> ***misrepresented***.  The prospectuses warned that the Fund's hedging
> maneuvers might fail, not that the Fund would have no opportunity
> to use hedging maneuvers.  Plaintiffs allege the prospectuses were
> misleading as to the latter.  ***That the prospectuses disclosed the***
> ***possible inefficacy of hedges does not shield the Fund from***
> ***liability for misrepresenting the availability of hedging***
> ***opportunities***.

*Id*. at 729 (emphasis added).  In other words, in *Hunt* the cautionary language was inadequate

---

[4] Plaintiffs also rely on a Ninth Circuit case that is factually inapposite:  *Fecht v. Price Co*., 70 F.3d 1078 (9th Cir. 1995).  (Opp. at 18.)  In *Fecht*, the plaintiffs complained that the company's optimistic comments regarding its expansion schedule were misleading.  The company, in its motion to dismiss, pointed to the existence of some cautionary language that, if interpreted properly, would correct and counterbalance the optimistic statements.  The Ninth Circuit reversed the district court's dismissal of the complaint because the imprecise and generalized cautionary language "not only does not cure, but arguably contributes to the alleged misconception."  *Id*. at 1081.  Here, in contrast, the clear cautionary language in the PPMs is tied directly to the risks that allegedly brought about Plaintiffs' alleged losses.

because it warned of one thing, while the plaintiffs were injured by something else entirely.

A somewhat similar situation arose in *Feiner*. In that case, shareholders brought suit against a corporation, alleging that the corporation's prospectus contained material misrepresentations regarding the recognition of revenues from the "sale" of the corporation's license or consulting agreements. The corporation moved to dismiss based on some generalized warnings about the difficulty of "closing certain large license transactions on a timely basis." *Feiner*, 11 F. Supp. 2d at 208. The district court denied the motion, because the warnings were not tied directly to the allegedly undisclosed risk. *Id.* (the warnings were "not so precise and obvious that it renders plaintiffs' allegations unactionable as a matter of law"). Indeed, there was a complete disconnect between what the prospectus said would happen and what plaintiffs alleged did in fact happen: "According to plaintiffs, SS&C recognized revenue on the license or service agreements at the time an agreement was signed, contrary to statements in the Prospectus that the revenue would be recognized only when SS&C's obligations to the customer were substantially satisfied." *Id.* at 209.

Here, unlike the situation in *Hunt* and *Feiner*, Plaintiffs were allegedly injured by the exact risks that were warned of in the PPMs. In its PPMs, DBSI did not say that auctions would never fail. Instead, DBSI expressly warned (and repeatedly so) that auctions could fail and that if an auction did fail, Plaintiffs might "***not*** be able to sell some or all of [their] Certificates at that time."[5] In its PPMs, DBSI did not say that a secondary market would automatically and necessarily develop for its auction-rate securities and that any such secondary market would last indefinitely. Instead, DBSI expressly warned that such markets "may ***not*** develop" and that "[i]f a secondary market does develop, it might ***not*** continue or it might ***not*** be sufficiently liquid to

---

[5]    Capstan PPM at 9 (emphasis added); *see also id.* at 12. *See also* Pivot PPM at 9, 12; Camber PPM at 9, 12.

allow resale of the Certificates."[6]  In its PPM, DBSI did not say that it would never place a support bid in an auction.   Instead, DBSI expressly warned (and repeatedly so) that it might submit orders for "its own account" and that in so doing it may gain "an advantage over other Potential or Existing Holders."[7]

In short, DBSI warned of the precise risks complained of by Plaintiffs and did so in a direct and obvious manner.  No reasonable person reading any of the PPMs, let alone a sophisticated and large scale purchaser of auction-rate securities such as Plaintiffs, "could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist."  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002).  Under the well-established law of the Second Circuit that is all that DBSI needed to do in order to be protected by the "bespeaks caution" doctrine.  *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (affirming dismissal because the relevant cautionary language was "prominent and specific" and directly addressed "the risk that plaintiffs claim was not disclosed"); *Halperin*, 295 F.3d at 359 (affirming dismissal because the relevant risk that the stocks might not be registered was explicitly addressed in the offering memoranda); *see also Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 474 (S.D.N.Y. 2009) (dismissing complaint because a reasonable investor could not have been "misled into thinking that the risk of a faulty risk management system did not actually exist" when the prospectus disclosed that exact risk).

Because the PPMs disclosed the very risks that allegedly injured Plaintiffs, the FAC is nothing more than a pleading that improperly alleges "fraud by hindsight."  *Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) (granting motion to dismiss because allegations of problems with quality control in the manufacture of

---

[6]     Capstan PPM at 11 (emphasis added).  *See also* Pivot PPM at 11; Camber PPM at 11.

semiconductor chips amounted to "pleading by hindsight" when a disclosure covered the "exact risk later realized"); *Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 191 (S.D.N.Y. 2006) (dismissing action where "each of the matters that Plaintiffs claim [Defendant] failed to disclose had, in fact, been disclosed to the market").

In light of the PPMs' specific and prominent disclosures regarding the possibility of auction failure, the collapse of secondary markets, and the possibility of DBSI placing support bids, any alleged misrepresentation or omission regarding these topics by DBSI should be deemed immaterial as a matter of law.

### 2.    Plaintiffs Do Not Allege a Strong Inference of Scienter

Under the PSLRA, Plaintiffs were required to state "with particularity" facts giving rise to a "strong inference" that DBSI acted with fraudulent intent.  15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).  A "strong inference" can be established through factual allegations "(1) showing that the defendants had both motive and opportunity to commit the [alleged] fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Kalnit*, 264 F.3d at 138-39.  Plaintiffs argue that they have "sufficiently pled scienter under both tests."  (Opp. at 19.)  Plaintiffs' argument cannot withstand close scrutiny.

### a.    *Plaintiffs Fail to Allege a Fraudulent Motive*

Plaintiffs argue that Deutsche Bank's alleged desire to continue receiving fees and commissions associated with ARS offerings and auctions (FAC ¶¶ 3, 34-35, 79, & 105) is a "sufficient 'motive' to establish scienter."  (Opp. at 24.)  Plaintiffs' argument is fatally weakened by their failure to distinguish the single most important case cited in Deutsche Bank's opening

---

[7]    Capstan PPM at 11; *see also id*. at 20.  *See also* Pivot PPM at 11, 20; Camber PPM at 11, 20.

brief regarding scienter:  *In re: Citigroup Auction Rate Securities Litig.,* No. 08 Civ 3095, 2009

WL 2914370 (S.D.N.Y. Sept. 11, 2009).  (*See* Opn. Br. at 16.[8])

Plaintiffs' omission is a telling one because *Citigroup* is an auction-rate securities case

involving claims nearly identical to those that Plaintiffs allege in this case.  In *Citigroup*, as

alleged here, the defendants underwrote and managed auctions for ARS.  The plaintiff in

*Citigroup*, like Plaintiffs here, alleged that the defendants "regularly and increasingly

intervened" in auctions by submitting support bids and that this conduct "prevented Defendants'

auctions from failing."  *Citigroup*, 2009 WL 2914370 at *1.  *Compare* FAC ¶ 58 (DBSI

"frequently and repeatedly submitted 'support bids' for those ARS on which it served as a sole or

lead manager, and did so because, but for DBSI's repeated interventions to prop up the auctions,

widespread auction failures would have occurred").  Like Plaintiffs, the ARS purchaser in

*Citigroup* alleged that the defendants violated Section 10(b) of the Exchange Act and attempted

to meet his scienter pleading requirement by alleging that defendants sought to earn more fees by

their alleged misconduct.  Judge Swain found such allegations to be patently deficient:

> Plaintiff has failed to allege facts giving rise to a strong
> inference of scienter … by alleging motive and opportunity ….
> Plaintiff's conclusory allegations regarding Defendants' motive for
> the alleged manipulation focus principally on Defendants' desire to
> sell Citigroup ARS … to obtain fees for services in connection
> with the auctions; they are ***insufficient*** to give rise to a strong
> inference of scienter.
>
> …
>
> ***Courts have repeatedly rejected conclusory allegations***
> ***regarding the motivation to earn unspecified fees as a basis for***
> ***inferring scienter***.  *See, e.g., Edison Fund v. Cogent Inv.*
> *Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008)
> ("To accept a generalized allegation of motive based on a desire to

---

[8]    In their Opposition, Plaintiffs do attempt to distinguish *Citigroup* in connection with other issues, such as the
application of the "fraud on the market" theory (Opp. at 28) and loss causation (Opp. at 37), but not in
connection with the issue of scienter.

> continue to obtain management fees would read the scienter
> requirement out of the statute."); *In re Marsh & McLennan
> Companies, Inc. Securities Litigation*, 501 F. Supp. 2d 452, 489
> (S.D.N.Y. 2006) ("Although an auditor's receipt of consulting fees
> inordinately disproportionate to its auditing fees may give rise to a
> proper inference of motive ... allegations of payment for services
> rendered are generally inadequate."); *Vogel v. Sands Bros. & Co.,
> Ltd.*, 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001) ("alleged desire to
> realize greater transaction fees and its close relationship with
> [financial services holding company client] are insufficient to show
> an improper motive [on part of the investment banking firm]").

*Citigroup*, 2009 WL 2914370 at *6 (emphasis added). *See also Defer LP v. Raymond James

Financial, Inc.*, 654 F. Supp. 2d 204, 217-18 (S.D.N.Y. 2009) (dismissing complaint alleging

fraud with regard to ARS, stating, "[t]he complaint states that defendants' motive was to

'perpetuate the artificial ARS market' so that they could earn substantial sales commissions and

fees for underwriting the securities and managing ARS auctions. An allegation that defendants'

motive was merely to increase or maintain profit such as this is ***insufficient***.  This Circuit has

repeatedly held that similar allegations of a generalized motive that could be imputed to any for-

profit endeavor therefore are ***not*** sufficiently concrete for purposes of inferring scienter."

(emphasis added).  *See generally In re Merrill Lynch & Co., Inc. Res. Rpts. Sec. Litig.*, 289 F.

Supp. 2d 416, 428 (S.D.N.Y. 2003) (dismissing securities fraud lawsuit due to inadequate

scienter allegations, stating, "[i]f this Court were to accept the plaintiffs' allegations of scienter

as adequate, it would essentially read the scienter element out of existence.  All firms in the

securities industry want to increase profits …. Allegations such as these are inadequate to plead

motive to commit a fraud on the market or the public under the securities laws"); *In re Doral

Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 465 n.1 (S.D.N.Y. 2008) (granting motion to

dismiss, stating "[Plaintiffs'] allegations of motive come down to the allegation that PwC

received fees from Doral for auditing, consulting, and tax services and wished to continue to

receive fees.  This general allegation that PwC earned fees from Doral is insufficient to plead

motive.") (citation omitted); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions").

Instead of addressing *Citigroup*'s findings and reasoning with regard to scienter, Plaintiffs ignore it and, instead, cite to a number of other cases that purportedly support their argument. None of the cases upon which Plaintiffs rely involves auction-rate securities. Moreover, Plaintiffs' cases are easily distinguishable from the case at bar. For example, one of the cases upon which Plaintiffs principally rely is *Varlen v. H.J. Meyers, Inc.*, No. 97 Civ. 6742, 1998 WL 395266 (S.D.N.Y. July 14, 1998). (Opp. at 24.) In *Varlen*, the court refused to dismiss plaintiffs' claims where the alleged motive of a brokerage house to commit fraud was, *inter alia*, to enhance its underwriting business by keeping the prices of stocks of companies for which it performed underwriting business at artificially elevated levels to dispel the notion that it was a penny stock brokerage and to bolster the credibility of its research department. *Id.* at *4-5. Yet, in that case, the complaint laid out extremely specific and detailed allegations to support its theory for motive. *Id.* at *1 ("The complaint describes in ***great detail*** the various tactics that were used by H.J. Meyers managers to induce brokers to sell Palomar stock"). In contrast, Plaintiffs operate at a high level of abstraction, arguing that DBSI made support bids at "every" auction (Opp. at 2, 3, 20, 21, 27), but failing to provide any factual detail whatsoever in the FAC about the nature of any supporting bid by DBSI for any ARS that it underwrote (including the ones that Plaintiffs allegedly purchased) at any auction and the purported effect of that bid on the market for that particular security. Instead, the FAC alleges in a wholly conclusory manner that

17

each supporting bid was so significant for each and every auction that without them the auction would have failed.  (*See* FAC ¶ 58.)  Such conclusory allegations fall well short of the pleading requirements for Rule 8, let alone for Rule 9 and the PSLRA.

In addition to relying upon cases that are easily distinguishable on factual grounds, Plaintiffs also rely on cases that are procedurally inapposite.  For example, Plaintiffs cite to *SEC v. O'Meally*, No. 06 Civ. 6483, 2008 WL 4090461 (S.D.N.Y. September 3, 2008).  (Opp. at 24.) The PSLRA's heightened pleading requirements, however, do not apply to actions brought by the SEC.  *See S.E.C. v. Lucent Technologies, Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005) ("the heightened requirements for pleading scienter under the PSLRA do ***not*** apply to actions brought by the SEC" (emphasis added)); *S.E.C. v. Prater*, 296 F. Supp. 2d 210, 215 (D.Conn. 2003) ("Since actions brought by the SEC are ***not*** considered 'private litigation,' the standard imposed in the PSLRA for pleading scienter does not apply to the SEC" (emphasis added)); *S.E.C. v. ICN Pharm., Inc.*, 84 F. Supp. 2d 1097, 1099 (C.D.Cal. 2000) ("[T]he 'more rigorous' pleading requirements under the PSLRA, which go beyond the Rule 9(b) requirements only apply to private securities fraud actions; they do ***not*** apply to a case, such as this, brought by the SEC" (emphasis added)).  Similarly, Plaintiffs cite to *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc*., 651 F. Supp. 2d 155 (S.D.N.Y. 2009) (Opp. at 24), which was decided under New York common law, ***not*** under the PSLRA and its "strong" inference of scienter standard.  15 U.S.C. § 78u-4(b)(2).

In short, Plaintiffs' deliberate failure to address *Citigroup* with regard to the issue of scienter should be regarded for what it is:  a *de facto* admission that they have not and cannot allege a fraudulent motive.  *See Chill v. G.E. Co*., 101 F.3d 263, 268 (2d Cir. 1996) (affirming dismissal without leave to amend due to failure to plead scienter with the requisite particularity,

stating, "[t]he motive to maintain the appearance of … the success of an investment, will naturally involve benefit to a corporation, but does not 'entail concrete benefits'" (citations omitted)).

### b.    *Plaintiffs Fail to Allege Conscious Misbehavior*

In the FAC, Plaintiffs allege that DBSI engaged in a sustained scheme to manipulate the market by purchasing ARS for its own account at auctions on which it served as lead manager. (FAC ¶ 39 ("the only thing preventing auction failures was DBSI's contribution of its own capital to prop up the auctions")).  In their Opposition, Plaintiffs maintain that this scheme is "strong" circumstantial evidence of conscious misbehavior or recklessness.  (Opp. at 19-22.) Plaintiffs' argument is without merit, because it is well established that DBSI's alleged purchases of ARS for its own account preclude rather than support an inference of scienter.

Numerous courts – both in this District and across the country – have held that the purchase of securities belies any intent to defraud.  *See, e.g*., *Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. August 22, 2005) (granting motions to dismiss, stating "it would make no sense for defendants to invest literally billions of dollars in a venture that they knew would fail," "[t]hese facts … compel the conclusion that defendants did not act with the scienter that is required under the securities laws"); *In re Bristol-Meyers Squibb Sec. Litig*., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (granting motion to dismiss and holding that increased holdings in securities was a fact "wholly inconsistent with fraudulent intent"); *Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co*., 652 F. Supp. 2d 576, 590 (E.D. Pa. 2009) (granting motion to dismiss because plaintiffs failed to demonstrate a fraudulent intent in selling securities where the defendants retained an economic interest in those securities, stating, "[t]o find that Defendants acted with scienter in selling securities to Plaintiffs based on the same underlying mortgage loans that Defendants accepted as collateral would be 'to assume that the

19

Defendants intentionally defrauded the Plaintiffs to their own ultimate detriment'"); *In re Thoratec Corp. Sec. Litig.*, No. C-04-03168, 2006 WL 1305226, at *11 (N.D. Cal. May 11, 2006) (granting motion to dismiss, holding that purchase of stock at allegedly inflated prices undermined finding of scienter).

In addition, DBSI prominently and specifically disclosed that it may make support bids, thereby further refuting any inference of conscious misbehavior or recklessness.  *See Avon Pension Fund v. GlaxoSmithKline PLC*, No. 08-4363-CV, 2009 WL 2591173, *2 (2d Cir. Aug. 24, 2009) (affirming dismissal of securities fraud complaint where plaintiffs alleged that defendants omitted negative drug meta-analysis from public statements, but defendants' disclosure of the meta-analysis on its website "effectively refutes plaintiffs' claim that the pleaded circumstances support the requisite scienter).  *See also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("detailed risk disclosure negates an inference of scienter").

Again, Judge Swain's ruling in *Citigroup* is directly on point:

> Plaintiff has also failed to allege particularized facts giving rise to a strong inference of scienter based on circumstantial evidence of conscious misbehavior or recklessness.  Instead, the very market conditions … that Plaintiff cites in his Complaint in connection with Defendants' intent to continue receiving ARS-related fees, give rise to ***an opposing and compelling inference that Defendants only engaged in bad (in hindsight) business judgments in connection with ARS, and did not engage in the alleged conduct with an intent to deceive investors***. Plaintiff's failure to allege particularized facts giving rise to an inference of scienter at least as strong as any opposing inference requires dismissal.

*Citigroup*, 2009 WL 2914370 at *6 (emphasis added).  Again, Plaintiffs pointedly ignore *Citigroup* with regard to the issue of scienter.

In sum, the strong inference that arises from the allegation that DBSI placed supporting bids is not fraud. Instead, as Judge Swain put it, the most that can be said about DBSI's alleged purchases is that DBSI "engaged in bad (in hindsight) business judgments in connection with ARS." *Citigroup*, 2009 WL 2914370 at *6. *See also Ashland, Inc. v. Oppenheimer & Co., Inc*., No. 09 Civ. 00135, 2010 U.S. Dist. LEXIS 15335, *34 (E.D. Ky. Feb. 22, 2010) (dismissing with prejudice plaintiff's ARS claims, stating, "the mere fact that Oppenheimer profited from the sales of ARS is ***not*** in and of itself indicative of scienter" (emphasis added)); *Tellabs* 551 U.S. at 323 (noting that courts must weigh the "plausible nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff");. Because Plaintiffs have not put forth "strong evidence of conscious misbehavior or recklessness," they have not alleged a "strong" inference of scienter. Accordingly, their misrepresentation claim should be dismissed.

### 3.    Plaintiffs Do Not Allege Justifiable Reliance

Plaintiffs did not rely directly on any alleged misrepresentation by Deutsche Bank – *i.e*., they did not take the time to review, *inter alia*, the extensive PPMs that DBSI prepared for each ARS before making their purchases. As a result, Plaintiffs' fraud claim is irredeemably flawed unless they allege facts sufficient to establish the "fraud on the market" presumption, which they have not done. As for Plaintiffs' reliance on the "fraud created the market" theory, that theory has not been adopted by either the U.S. Supreme Court or the Second Circuit; as a result, courts within this district have rightfully been reluctant to adopt it.

### a.    *Plaintiffs' "Fraud-on-the-Market" Theory is Inapplicable*

It is well established that "Plaintiffs can ***only*** be presumed to have relied on the market prices ***if*** the market in which they purchased their shares is ***efficient***." *See In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 295 (S.D.N.Y. 2008) (emphasis added); *see also Basic v. Levinson*, 485 U.S. 224, 241-42 (1988) (holding that plaintiffs who purchase their securities in

the open market do not have to plead direct reliance because the price of a security in an efficient market is presumed to reflect all relevant public information about the security).

Plaintiffs argue that they have "sufficiently pled that the market for debt securities, in which the Deutsche Bank ARS were traded, was efficient," because the FAC alleges that "this market for debt securities was 'well-developed and efficient.'" (Opp. at 26.) Leaving aside the obvious circularity of such an argument, Plaintiffs ignore the fact that the FAC contains allegations which directly refute any notion of efficiency.

Numerous courts have identified the necessary characteristics of an "efficient" market. *See, e.g.*, *In re Initial Public Offering Sec. Litig.*, 227 F.R.D. 65, 107 (S.D.N.Y. 2004) (discussing cases), *reversed on other grounds*, 471 F.3d 24 (2d Cir. 2006). For instance, echoing the Supreme Court's reference in *Basic* to markets "literally involving millions of shares changing hands daily," *Basic*, 485 U.S. at 243, courts regularly look to whether a security trades on a national exchange like the NYSE or NASDAQ as "a good indicator of efficiency." *In re Initial Public Offering Sec. Litig.*, 227 F.R.D. at 107 n.324. Thus, for example, courts expect an efficient market to have characteristics such as large daily trading volumes and a significant number of analysts reporting on the security. *Id* at 107 n.323 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)). As a general rule, courts do not find that "debt securities," such as the ones at issue here, are traded in "efficient" markets. *See, e.g., Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204-11 (2d Cir. 2008) (affirming denial of class certification in a securities fraud action because, in part, the debt securities at issue were not traded in an efficient market).[9]

---

[9]    The finding of an efficient market in debt securities is invariably an exception that proves the rule. *See, e.g., In re Enron Corp. Securities*, 529 F. Supp. 2d 644, 755 (S.D.Tex. 2006) (finding an efficient market for Enron's bonds because, *inter alia*, there was extensive analyst and media coverage of Enron's long term debt and over 15,000 trades during class period).

Here, Plaintiffs have not alleged any facts establishing that the market for ARS is "efficient," as that term has been defined by courts construing federal securities laws.  Indeed, Plaintiffs have alleged facts demonstrating the exact opposite, that ARS is necessarily "inefficient."  Instead of alleging that ARS are traded in large volumes on a daily basis on impersonal exchanges such as the NYSE and the NASDAQ, Plaintiffs allege (as they must) that these securities are traded only on a periodic basis in relatively small, highly structured "Dutch auctions" that are conducted only "every 7, 28 or 35 days."  (FAC ¶¶ 21-23.)  Moreover, there are no allegations of any investment analyst, let alone a significant number of such analysts, reporting regularly on particular ARS issues.

Where, as here, a plaintiff's "own allegations and evidence demonstrate that an efficient market cannot be established," the "fraud-on-the-market" presumption is not applicable.  *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 42-43 (2d Cir. 2006).  In short, Plaintiffs' "fraud-on-the-market" theory is refuted by their own allegations.

> **b.    *Plaintiffs' "Fraud-Created-the-Market" Theory is Inapplicable***

With regard to their argument that they are entitled to a presumption of reliance based on the "fraud-created-the-market" theory, Plaintiffs concede that this theory has not been adopted by either the Second Circuit or the Supreme Court.  (Opp. at 30.)  Plaintiffs, however, do not acknowledge that courts within this district have been highly reluctant to adopt this theory.  *See, e.g., In re Refco, Inc., Sec. Litig.*, 609 F. Supp. 2d 304, 318 (S.D.N.Y. 2009) ("This Circuit has never adopted this presumption and it has been criticized by at least two other Courts of Appeal"); *In re Towers Fin. Corp. Noteholders Litig.*, No. 93 Civ 0810, 1995 WL 571888, *22 (S.D.N.Y. Sept. 20, 1995) (discussing doubtful viability of theory in Second Circuit and declining to adopt theory under facts of that case because "notes were newly issued to a non-developed market").

Despite the absence of any controlling authority adopting or even encouraging the adoption of the "fraud-created-the-market" theory, Plaintiffs nonetheless, urge this Court to adopt and apply this theory because there is a split among the circuits, with some circuits adopting the theory[10] and others rejecting.[11]  Even if this was a prudent and proper course for this Court to follow, the "fraud-created-the-market" theory is unavailable here:

> [C]ourts that apply the presumption appear to agree that the touchstone of this standard is "unmarketability."  Such unmarketability" must mean either economic unmarketability, which occurs when a security is patently worthless, or legal unmarketability, which occurs when a regulatory or municipal agency would have been required by law to prevent or forbid the issuance of the security.

*In re Refco, Inc., Sec. Litig.*, 609 F. Supp. 2d at 304.

Here, Plaintiffs have not alleged any facts (as distinct from conclusory allegations) that any of the Deutsche Bank ARS that they purchased were unmarketable – either legally or economically.[12]  Indeed, Plaintiffs have acknowledged that even when an auction fails due to insufficient demand, the Plaintiffs retain ownership over the ARS and continue to receive interest payments at a "pre-determined maximum rate."  (FAC ¶ 23.)  Because Plaintiffs have not alleged the necessary facts to support the "fraud-created-the-market" theory, their misrepresentation claims are deficient.

                                        * * *

---

[10]  *Shores v. Sklar*, 647 F.2d 462, 470 (5th Cir. 1981).

[11]  *Eckstein v. Balcor Film Indus.*, 8 F.3d 1121, 1130-31 (7th Cir. 1993).

[12]  For example, Plaintiffs allege that the ARS sold by DBSI were "legally unmarketable" because they were sold to non-QIB investors.  (FAC ¶ 91.)  As discussed above and in Deutsche Bank's opening brief, this allegation is not supported by any facts whatsoever.  The sole basis for Plaintiffs' "legal unmarketablility' claims is certain unspecified information that Plaintiffs purportedly discovered "*suggesting*" that DBSI sold its ARS to individuals and/or entities that did not qualify for QIB status.  (FAC ¶ 52 (emphasis added).  Such assertions do not even meet the *Twombly/Iqbal* pleading standard for claims not involving fraud.

Assuming *arguendo* that Plaintiffs did allege facts showing that the market for ARS was "efficient" or that the securities at issue were "unmarketable," Plaintiffs' claims would still fail because they cannot show that their presumptive reliance was "reasonable." *Emergent Capital Inv. Mgmt. LLC v. Stonepath Group*., Inc., 343 F.3d 189, 195-96 (2d Cir. 2003) (affirming dismissal of 10b-5 claim where reliance was not reasonable).

Plaintiffs cannot claim that they reasonably relied on an assumption that the market for ARS was efficient – *i.e.*, determined by the natural market forces – in light of the 2006 SEC Order and DBSI's detailed disclosures, which warned of DBSI's potential role in supporting auctions.[13]  In *In re Citigroup*, Judge Swain held that essentially the same publicly available information about Citigroup's role in ARS auctions "negate[d] ***any*** inference that reliance [on the 'integrity' of the ARS market] … was reasonable." *Citigroup*, 2009 WL 2914370 at *7 (emphasis added).  Judge Swain reasoned that the 2006 SEC order and defendants' disclosures regarding the auction process "disclosed that the ARS market was not necessarily set by the 'natural interplay of supply and demand,' but that they could be set by broker-dealers."  *Id*.

Here, Plaintiffs, like the plaintiffs in *Citigroup*, allege that they relied on the "integrity of th[e] auction market before purchasing the Deutsche Bank ARS."  (FAC ¶ 85.)  As in *Citigroup*, DBSI disclosed the possibility and effect of it placing supporting bids in the auctions.  As in *Citigroup*, such disclosures – especially when combined with the 2006 SEC Order, which is part of the "total mix" of information available to the investing public that includes Plaintiffs –

---

[13]    Plaintiffs argue that the Court should disregard the 2006 SEC Order because "Deutsche Bank was not a party to that settlement."  (Opp. at 27.)  As explained in its opening brief, Deutsche Bank relies on the SEC order to show that the practice of making support bids was discussed in publicly available documents before Plaintiffs made the purchases at issue, and therefore, a sophisticated and large-scale purchaser of ARS, such as Plaintiffs, cannot claim reasonably not to have been on notice of it.  Moreover, as the press release for the 2006 SEC Order makes clear, the SEC was investigating "industry-wide practices" in the ARS market.  *See* SEC Press Release, "15 Broker-Dealer Firms Settle SEC Charges Involving Violative Practices in the Auction Rate Securities Market," No. 2006-83 (May 31, 2006), available at www.sec.gov/news/press/2006/2006-83.htm.  A

negates any inference that it was reasonable for Plaintiffs – sophisticated, large-scale purchasers of auction-rate securities – to assume that the ARS prices were set by the "natural interplay of supply and demand." In the absence of such reasonable reliance, Plaintiffs' claims fail as a matter of law.

### 4.    Plaintiffs Do Not Allege Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc*., 396 F.3d 161, 172 (2d Cir. 2005). Establishing loss causation is critical because Section 10(b) is not meant to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Plaintiffs argue that they have properly alleged loss causation because they have alleged that the value of their ARS dropped after DBSI stopped making its allegedly manipulative support bids and that "[t]his is all that <u>Dura</u> requires." (Opp. at 32.) Plaintiffs' argument is flawed for two principal reasons: the FAC's loss causation allegations lack (a) particularity and (b) plausibility.[14]

### a.    *Plaintiffs' Loss Causation Allegations Lack Particularity*

The FAC does not contain the factual detail that it must in order to properly allege loss causation. As Deutsche Bank has previously noted, the FAC is bereft of any facts whatsoever

---

true and correct copy of this press release is attached as Exhibit B to the Suppl. Vassos Declaration. *See also* Suppl. RJN.

[14]    Plaintiffs also argue that they have properly alleged a cognizable loss because they recently sold their ARS to DB-AG "at an average price of 42 cents on the dollar." (Opp. at 35.) Plaintiffs' argument is without merit for two principal reasons. *First*, when Plaintiffs sold their ARS to DB-AG, the securities were not in default; in fact, they were performing in exact accordance with their terms. In other words, instead of electing to sell the ARS to DB-AG, Plaintiffs could have elected instead to wait and sell their securities at another auction or hold them until maturity. Consequently, Plaintiffs' decision to sell now should not be seen as evidence of a cognizable loss, but rather as simply an independent investment decision by Plaintiffs. *Second*, regardless of how one views Plaintiffs' decision to sell their ARS now rather than at some later time, Plaintiffs' decision to

about what level of support, if any, that DBSI previously provided for the ARS at issue.  Such

factual allegations are imperative.  *See In re Sterling Foster & Co., Inc. Sec. Litig*., 222 F. Supp.

2d 289, 307-08 (E.D.N.Y. 2002) (finding that plaintiff's loss causation claims were "not pled

with the particularity required by Rue 9(b) and the PSLRA" because, while plaintiffs alleged a

general practice of manipulation, they failed to "describe actual acts of manipulation; which

defendants performed them; and a concrete effect the manipulation had on the market"); *Catton*

*v. Defense Tech. Sys., Inc*., No. 05 Civ. 6954, 2006 WL 27470, at *9-10 (S.D.N.Y. Jan. 3, 2006)

(granting defendants' motion to dismiss Section 10(b) claims due to insufficient loss causation

allegations, stating that plaintiffs must allege factual support, such as specific dates and amounts

of losses, to adequately plead loss causation).

Under Plaintiffs' loss causation theory, when they purchased their ARS they were

purportedly unaware of the extent to which DBSI supposedly supplemented demand by bidding

in the auctions.  At a minimum then, this theory requires Plaintiffs to allege that the subsequent

auctions would not have failed even if DBSI had maintained the same level of support (*i.e*.,

demand) for ARS as they did when Plaintiffs purchased their ARS.  Without such factual detail,

Plaintiffs have no basis to claim that anything besides other market forces caused their purported

investment losses.  *See Ashland, Inc.*, 2010 U.S. Dist. LEXIS 15335 at *20 (dismissing with

prejudice plaintiff's ARS claims, stating, "[t]hat these securities became illiquid does ***not***

automatically render Oppenheimer's statements actionable" (emphasis added)); *see also In re*

*Vivendi Universal, S.A. Sec. Litig*., No. 02 Civ. 5571, 2009 WL 1066254, *11 (S.D.N.Y. Apr. 21,

2009) ("plaintiffs must... disaggregate the declines or some rough percentage of the declines

from losses resulting from other, non-fraud-related events").

---

sell is ***not*** addressed or even referenced in the FAC. As a result, it is has no bearing on the resolution of
Defendants' motion to dismiss the FAC.

Here, Plaintiffs' loss causation allegations are effectively the same as those the Supreme Court rejected in *Dura*. In *Dura*, the Supreme Court characterized that pleading of loss causation as follows: "Most importantly, the complaint says the following (and nothing significantly more than the following) about economic loss attributable to the misstatement: 'In reliance on the integrity of the market, [the plaintiffs] … paid artificially inflated prices for Dura securities' and the plaintiff suffered 'damage[s]' thereby." 544 U.S. at 339-40. Here, Plaintiffs allege that they "relied on the integrity of the auction market" and that but for the alleged fraud they "would not and/or could not have purchased" the securities at issue or "would not have purchased them for the prices and/or at the interest rates at which [they] did." (FAC ¶¶ 84-85; *see also id*. ¶ 99-103.) Contrary to Plaintiffs' assertion, *Dura* requires more than what Plaintiffs have alleged. *See In re AOL Time Warner, Inc. Sec. Litig*., 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) ("[B]are allegations that an undisclosed risk materialized to cause plaintiff's loss are insufficient [to plead loss causation]").

### b. *Plaintiffs' Loss Causation Allegations Lack Plausibility*

The FAC mistakes *correlation* for *causation*. Plaintiffs have alleged that auctions began to fail at the same time that DBSI stopped providing support bids, but they have not alleged facts showing DBSI's actions, as opposed to some other factor or event, actually caused the collapse of the ARS market. *Lentell*, one of the cases upon which Plaintiffs rely illustrates this point nicely. (Opp. at 32-33.) In that case, Merrill Lynch analysts allegedly issued "buy" recommendations for internet stocks. Plaintiff purchased stocks as a result, and suffered losses when the tech market declined. The Second Circuit upheld dismissal for failure to plead loss causation, because it was the market decline that caused the losses. *Lentell*, 396 F.3d at 174 (stating plaintiffs' loss coincided with a market phenomenon indicated by "comparable losses to other investors," and not deceptive conduct). As the Supreme Court has explained, a change in

28

the price of a security from the date of purchase to the date of sale "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura*, 544 U.S. at 342-43. It is the plaintiff's burden to isolate the impact of the alleged fraud from this "tangle of factors affecting price." *Id.*

Plaintiffs have not and cannot meet their burden. Plaintiffs' alleged losses began in the summer and fall of 2007, when the worst financial crisis since the Great Depression began. The FAC, however, makes no attempt whatsoever to put forward facts showing that Plaintiffs losses were due to the alleged fraud and not the general instability in the credit markets. Where other ARS plaintiffs have alleged "loss correlation" but failed to allege "loss causation," courts have dismissed the complaints. *See, e.g., Healthcare Finance Group, Inc. v. Bank Leumi USA*, No. 08 Civ. 11260, 2009 WL 3631036, *4 (S.D.N.Y. Oct. 26, 2009) (dismissing with prejudice § 10(b) claim based on purchase of ARS, because plaintiffs failed to allege that misrepresentations or omissions regarding liquidity and support bids caused failure of auctions because allegations about market events undermined any causal connection between alleged fraud and any economic loss); *Citigroup*, 2009 WL 2914370, at *6 (noting role of market conditions and "subprime crisis"). Such decisions are consistent with cases involving other types of securities. *See, e.g., Luminent*, 652 F. Supp. 2d at 593 (noting recent "unprecedented deterioration in market conditions" and dismissing securities fraud claim where "[p]laintiffs make no allegations that would allow the Court to apportion any losses between Defendants' misrepresentations and the significant declines in market value for mortgage-backed securities").[15]

---

[15]    In its opening brief, Deutsche Bank noted that Plaintiffs' parent entity asserted in a public filing with the SEC that the ARS auctions failed, not because of fraud, but because of "uncertainties" in the broader "credit markets." (Opn. Br. at 20.) In response, Plaintiffs argue that this statement is irrelevant because it was made by Teva in its 2007 annual report (submitted to the SEC on or about February 28, 2008), which was prepared

Plaintiffs attempt to escape from their failure to plead loss causation adequately by arguing that whether DBSI's alleged fraud or the "Great Recession" caused Plaintiffs' alleged losses is a "factual issue to be resolved at trial." (Opp. at 36.) Plaintiffs' argument misses the point. The issue here is not to determine what actually did or did not happen; rather the issue is to determine whether Plaintiffs have alleged, with the requisite particularity, sufficient facts to proceed with their claims. The inescapable answer is that they have not. Where, as here, a plaintiff fails to allege sufficient facts to support his or her theory of loss causation, a district court will dismiss the claim and the Second Circuit will affirm such a decision. *Lentell*, 396 F.3d at 174.

In short, the FAC's loss causation allegations are defective because they are not plausible. *Twombly* 550 U.S. at 557-58 (reaffirming that loss causation allegations must at a minimum be "plausible"); *see also Dura*, 544 U.S. at 347 (explaining that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with "'a largely groundless claim'" be allowed to "'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value'" (*quoting Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975). Put in its most colloquial terms, Plaintiffs have chosen to deliberately ignore the proverbial 600-pound gorilla in the room (*i.e.*, the "Great Recession") and have thereby fatally compromised their pleading.

---

"before" the extent of Deutsche Bank's allegedly fraudulent conduct was disclosed. (Opp. at 36.) Plaintiffs is without merit because Plaintiffs took the same exact position a year later. In its 2008 Annual Report, Teva stated, "The ***uncertainties in the credit markets*** have resulted in unsuccessful auctions for the auction rate securities that we hold." Teva's 2008 Annual Report at 70. Teva's 2008 Annual Report was filed with the SEC on or about February 27, 2009 – just a few months before Plaintiffs commenced this action and, as Plaintiffs and their counsel are well aware, years after disappointed ARS investors had begun filing securities fraud lawsuits against Deutsche Bank. (*See* Opp. at 8 n.2 (*citing* a 2007 ARS case filed against Deutsche Bank in this district, *Xethanol Corp. v. Deutsche Bank Securities*, Case No. 07-cv-11161 (AKH)). Plaintiffs also suggest that Defendants' citation to Teva's annual report should be disregarded because the report is hearsay. (Opp. at 36). Plaintiffs' argument is utterly without merit, as an out-of-court statement by a party offered against that party is "not hearsay," but an admission. Fed. R. Evid. 801(d)(2).

Because Plaintiffs' loss causation allegations are neither sufficiently detailed nor credibly plausible, Plaintiffs' claims should be dismissed.

* * *

In summary, Plaintiffs' misrepresentation claim fails because Plaintiffs have not alleged facts showing that DBSI made a material misrepresentation with the requisite state of mind upon which Plaintiffs justifiably relied and which caused Plaintiffs' alleged loss.

### B.     Plaintiffs' Market Manipulation Claim Fails for a Lack of Particularity

The Second Circuit requires a market manipulation claim brought under Section 10(b) to be pled with particularity, including detailed allegations about "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 101. Plaintiffs attempt to side-step the Second Circuit's pleading requirements, contending that their pleading obligation is met by merely alleging the existence of a broad manipulative scheme, without providing any details regarding the particular acts of the alleged manipulation. (Opp. at 39-42.)

Plaintiffs' attempt to reduce their pleading burden is futile. Decision after decision in this Circuit has consistently held that such generalized pleading is insufficient to state an actionable manipulation claim under Section 10(b). *See, e.g., Scone Investments, L.P. v. American Third Market Corp.*, No. 97 Civ. 3802, 1998 WL 205338, *5 (S.D.N.Y. April 28, 1998) (dismissing market manipulation claim, stating "a plaintiff must do more than merely allege the existence of a manipulative scheme"); *Baxter v. A.R. Baron & Co.*, No. 93 Civ 3913, 1995 WL 600720, *6 (S.D.N.Y. Oct. 12, 1995) (dismissing market manipulation claim, stating "[t]he plaintiffs allege a market manipulation scheme over twenty-six paragraphs. These paragraphs are long on innuendo but lacking in factual assertions or specificity with respect to how, when, and under

31

what circumstances the alleged fraud was perpetrated on the plaintiffs."); *Connolly v. Havens*, 763 F. Supp. 6, 13 (S.D.N.Y. 1991) (granting motion to dismiss Section 10(b) manipulation claim, because, *inter alia*, "[t]he allegations pertaining to the manipulation … fail to specify what fraudulent acts [the defendant] performed, when they were performed, the number of percentage of Holistic shares [the defendant] acquired, … and what [the defendant gained by his actions"). *Cf. Vetter v. Shearson Hayden Stone Inc*., 481 F. Supp. 64, 66 (S.D.N.Y. 1979) (dismissing Section 10(b) "churning" claim because plaintiff's complaint was "'virtually devoid of information as to the particulars of the 'improper course of conduct'").

A complaint alleging manipulation must provide detailed factual allegations about the alleged fraud. *See, e.g., Cowen & Co. v. Merrian*, 745 F. Supp. 925, 929 (S.D.N.Y. 1990) (finding plaintiff's allegations were sufficient to state a market manipulation claim where the complaint "***detail***[*s*] ***defendant's pre-purchase efforts to promote the sale of VGI stock as well as the date, quantity and price of each purchase in furtherance of the market manipulation scheme***. These acts clearly charge defendant … with an attempt at artificially affecting market activity in order to mislead investors and with enough specificity to meet the requirements of Rule 9(b)" (emphasis added)); *Kempner v. Oppenheimer & Co., Inc*., 662 F. Supp. 1271, 1282 (S.D.N.Y. 1987) (denying motion to dismiss because the complaint "constitutes an ***extensive*** statement of the facts upon which liability is claimed," finding that the complaint "meets the requirements of Rule 9(b) because it specifies ... [*inter alia*] the dollar amount of the purchases and sales, the number of transactions, the turnover ratio, the commission charges, margin interest charges and portfolio loss on the account" (emphasis added)); *Ross v. Bolton*, 639 F. Supp. 323, 324, 326 (S.D.N.Y. 1986) (finding that complaint sufficiently alleged market manipulation scheme to produce artificial increase in stock price because "[t]o illustrate the way in which the

manipulation occurred, plaintiffs have pled **41 factual instances** of Bolton's sale and repurchase transactions over the period between September 13, 1981 and December 16, 1982" (emphasis added)).

Here, with regard to the ARS purchased by Plaintiffs, the FAC does not identify the date, quantity, and price of any support bid allegedly made by DBSI in furtherance of the alleged market manipulation scheme.  Indeed, the FAC does not even allege facts from even one purportedly illustrative auction.  *See Joffee v. Lehman Bros., Inc*., 410 F. Supp. 2d at 192 (dismissing complaint, stating "Plaintiffs are not required to separately allege the elements of their Section 10(b) manipulative scheme claim for each individual transaction.  Rather, it is sufficient for a plaintiff to couple specific allegations concerning sample transactions with more general allegations concerning the conduct of the defendant").  Plaintiffs' burden to plead with particularity is even more demanding here due to the fact, as recognized by the 2006 SEC Order, that support bids are not inherently manipulative.

The fatally deficient nature of the type of pleading found in the FAC was recently recognized by Judge Swain, who dismissed a complaint alleging the identical scheme of ARS manipulation by Citigroup, Inc. and related entities.  *See Citigroup*, 2009 WL 2914370.  In that case, the plaintiff alleged: "Defendants regularly and increasingly intervened throughout the class period in order to prevent failed auctions. When supply exceeded demand, Defendants submitted bids to ensure that the ARS offered at auction would be sold. Defendants continued to underwrite and/or act as a broker-dealer managing auctions despite their knowledge that supply outstripped demand."  *Id*. at *2 (citations omitted).  The market manipulation allegation in *Citigroup* is the same as the one alleged here.  *See* FAC ¶ 58 (DBSI "frequently and repeatedly submitted 'support bids' for those ARS on which it served as a sole or lead manager , and did so

because, but for DBSI's repeated interventions to prop up the auctions, widespread auction failures would have occurred"). Judge Swain recognized, however, that the plaintiff's complaint did "not include specific allegations as to which Defendants performed what manipulative acts at what times and with what effect." *Id*. at *5 (emphasis added). Because the allegations were "general and conclusory," Judge Swain dismissed the complaint. *Id*. Although Deutsche Bank cited repeatedly to the *Citigroup* decision in its opening brief with regard to its arguments about Plaintiffs' market manipulation claim (Opn. Br.at 20, 21), Plaintiffs elected not to try and distinguish that case with regard to their market manipulation claims. (*See* Opp. at 37-42.) Plaintiffs' silence should be regarded as a *de facto* admission that there is no practical difference between their pleading and the one found wanting in *Citigroup*.

In short, Plaintiffs have alleged a market manipulation scheme by Deutsche Bank, but they have done so only in the vaguest of terms. Because Plaintiffs have not provided any of the detail routinely required by the Second Circuit and courts within this District, the FAC must be dismissed. Even if Plaintiffs had provided the required details about the alleged manipulation, they have not (as discussed above and in Deutsche Bank's opening brief) alleged sufficient facts to show either a "strong" inference of scienter or loss causation. As a result, Plaintiffs' market manipulation claim is fatally deficient and should be dismissed.

## C.    Plaintiffs Fail to State a "Control-Person" Claim Against DB-AG

Plaintiffs' Section 20(a) claim against DB-AG fails because Plaintiffs have not established a primary violation of Section 10(b) by DBSI. *In re Citigroup Sec. Litig*., 330 F. Supp. 2d 367, 382 (S.D.N.Y. 2004). Accordingly, Plaintiffs' Section 20(a) claim should be dismissed.

## IV.    <u>PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER NEW YORK COMMON LAW</u>

Because the elements of common law fraud in New York are "substantially identical to those governing Section 10(b)," *AIG Global Sec. Lending Corp. v. Banc. of Amer. Sec., LLC*, No. 01 Civ 11448, 2005 WL 2385854, *16 (S.D.N.Y. Sept. 26, 2005), and subject to the same heightened pleading requirements of Rule 9(b), *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Company of New York*, 375 F.3d 168, 187 (2d Cir. 2004), Plaintiffs' common law fraud claim suffers from the same deficiencies as Plaintiffs' Exchange Act claims and, therefore, should be dismissed as well.

## V.    <u>CONCLUSION</u>

For all the foregoing reasons, and for all the reasons stated in Defendants' moving papers, Defendants respectfully request that the Court dismiss the FAC in its entirety with prejudice.

Dated:    New York, New York
          February 24, 2010

                                        **MORGAN, LEWIS & BOCKIUS LLP**


                                        By: _____s/ John M. Vassos_____
                                              John M. Vassos

                                        101 Park Avenue
                                        New York, New York 10178
                                        (212) 309-6000
                                        jvassos@morganlewis.com

                                        *Attorneys for Defendants*
                                        Deutsche Bank Securities Inc. and Deutsche Bank AG

35